UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

S2 YACHTS, INC.,

       Plaintiff / Counter-Defendant,

                                               CASE No. 1:18-CV-389

v.

                                               HON. ROBERT J. JONKER

ERH MARINE CORP.,

       Defendant / Counter-Claimant.

_____/

## OPINION AND ORDER

### INTRODUCTION

ERH Marine Corp. was a long-time dealer for S2 Yachts, Inc. in the Dominican Republic. In November 2017, S2 Yachts informed ERH Marine it would not renew the Dealer Agreement that governed the parties' relationship, and that the arrangement would expire by its terms at the end of July 2018.  The Court previously resolved ERH Marine's non-renewal claims in favor of S2 Yachts and entered a Rule 54(b) Judgment against ERH Marine on them.  The Sixth Circuit Court of Appeals affirmed.[1]

What remained in the case following the Rule 54(b) Judgment was ERH Marine's contract claims regarding boat orders that were in the pipeline during the last year of the dealer relationship. One of the boats, an S408, was delivered without incident, but ERH Marine's orders for two S368 boats and a DC295 boat never resulted in deliveries to its customers.  ERH Marine says S2 Yachts failed to perform as contractually required on these three orders.  S2 Yachts says ERH Marine was

---

[1] ERH Marine also filed suit in the Dominican Republic.  The court hearing the case ruled against ERH Marine on the venue issues it raised.  (ECF Nos. 157 and 158).

to blame for any disappointment, and that there was no breach of contract by S2 Yachts.  The Court conducted a bench trial on these discrete contractual claims on October 12 and 13, 2021. This Opinion constitutes the Court's findings of fact and conclusions of law on the issues.

## I.    FINDINGS OF FACT

### A.  The Business Arrangement

S2 Yachts, Inc. ("S2 Yachts"), a Michigan corporation with a principal place of business in Michigan, manufactures and sells boats (at wholesale) under certain trade names.[2]  At issue in this case are a line of boats that S2 Yachts manufactured under the "Pursuit Boats" trade name. S2 Yachts sells its boats on a "model year" basis, with the model year running from the beginning of August through July of the following year.  A 2017 model year, for example, began on August 1, 2016, and ended on July 31, 2017.  The 2018 model year, in turn, began on August 1, 2017, and ended on July 31, 2018.

S2 Yachts' products reach retail customers through both domestic and international dealers doing business with the company.  Between 1999 and 2018, one of those dealers was ERH Marine Corp. ("ERH Marine"), a family run Panamanian corporation with its principal place of business in the Dominican Republic.  Eudaldo Hernandez formed what eventually became ERH Marine in 1999.  His son, Cristian, works with him in the business today.

S2 Yachts and its dealers work under written dealership agreements that govern a model year and that by their terms expire at the end of that year.  Sometimes S2 Yachts and its dealers execute an entirely new written agreement for a new model year.  Other times, the parties sign a

---

[2] During the time in question, S2 Yachts did business under a variety of trade names, including Pursuit Boats and Tiara Yachts.  S2 Yachts structured its business with sales teams for each line of boats.  Mark Taiclet, for example, was Director of Sales for Pursuit Boats.  For purposes of this opinion, the Court uses S2 Yachts and Pursuit Boats as referring to the same overall entity.

simple extension of the previous agreement for the upcoming model year.   In this case, the parties agree that the most recent full agreement entered into by ERH Marine for the Pursuit Boats brand was for the 2015 model year ("Pursuit Boats Dealer Agreement.")  (Trial Ex. 3).  Thereafter the parties operated under renewal agreements to extend their relationship through the 2018 model year.  (Trial Exs. 4, 5).  S2 Yachts notified ERH Marine in November of 2017 that it would not renew the agreement after the 2018 model year.  (Trial Ex. 21).

### B.  The Ordering Process

The Pursuit Boats Dealer Agreement set out in general terms the process by which ERH Marine would order boats from S2 Yachts.  (Trial Ex. 3).  Further detail was provided in a dealer manual for the model year that was incorporated in the Dealer Agreement.  (*See* Pursuit Boats Dealer Agreement § VI, Trial Ex. 3).   In the case of international dealers like ERH Marine, the terms and conditions of the ordering process for the 2018 model year was set out in an International Dealer Program. (Trial Ex. 40).  That program contained a Boat Order / Change policy that provided in part as follows:

- When placing an order, all the specifications, including engine(s), fabric & color selections must be submitted at the time of order placement.  If complete specifications are not submitted with the order, the order will not be accepted, nor will the production slot be reserved.

- An Order Verification report will be e-mailed to the dealership within one (1) week of when the boat order was submitted.

- Dealer is requested to complete confirmation form with payment & delivery information and sign, indicating approval of the order, and fax or e-mail, back to the Sales Department within the timeframe specified.

(International Dealer Program, Trial Ex. 40).

Under the terms of the program, before any particular dealer boat order was accepted and put in line for production, S2 Yachts had to prepare an order verification form. The form contained a description of the boat, the date it had been ordered, a hull number assigned to the boat, and a list of the various options and details the dealer, or its customer, had selected, such as stereos, navigation devices, hull color, and fabric colors. The order verification also included a total sale price. (*See, e.g.*, Trial Ex. 9). Both S2 Yachts and the dealer had to approve the terms before production would begin.

The Dealer Program for international dealers detailed a two-part payment process, beginning with a deposit and then payment of the final balance:

> The payment terms are:
>
> ➢ Twenty Percent (20%) deposit is required within five (5) days of placement of the order. A boat order will not be placed into production until the deposit has been received.
>
> ➢ The balance of the payment is due *(2) weeks prior* to the scheduled completion date.
>
> S2 Yachts reserves the right to change payment terms with your company based on our past relationship and payment experience. Changes to these payment terms will only be done before the initial deposit is made.

(*Id.*) (emphasis in original). Unlike domestic dealers, international dealers like ERH Marine did not qualify for floor plan financing arrangements; rather the entire boat had to be paid for in cash before delivery.

### C.  Production Planning

S2 Yachts reserved the contractual right to allocate the orders it received from the dealers, and to prioritize them as it saw fit. This was critical to S2 Yachts because it did not always have sufficient production capacity to make every boat dealers wanted to order. The Pursuit Boats

Dealer Agreement provided that "Pursuit reserves the right in its sole discretion and at any time to allocate Product among dealers and customers as it determines in its discretion[.]"  (Pursuit Boats Dealer Agreement § VII, Trial Ex. 3).  This became an important consideration for S2 Yachts on the boat orders in this case.

Production of boats was split between S2 Yachts' Florida and Michigan facilities.  Larger models in the Pursuit Boats brand, including S368s and S408s, were manufactured in the Michigan facility.  Smaller boats, like the DC295, were manufactured at S2 Yacht's facility in Florida.  In general, the Michigan facility had more production planning challenges than did the Florida facility.

Regardless of the production facility ultimately involved, the order process worked essentially the same way.  In particular, during the model year at issue here Les Ares was the salesperson responsible for ERH Marine.  He reported to S2 Yachts' overall Sales Director Mark Taiclet.  The key person managing the order process paperwork was Rebecca Check, the sales coordination manager for S2 Yachts.  She was the communication conduit between dealers like ERH Marine and upstream S2 Yachts sales personnel like Messrs. Taiclet and Ares.  And critically, she managed the order verification process that determined whether and when a particular dealer order actually got into the production schedule in Florida or Michigan.

Before submitting an order request, ERH Marine would contact Rebecca Check and ask about availability for upcoming production slots.  Rebecca Check would respond to ERH Marine with a potential slot, and ERH Marine used this date in preparing an invoice and payment schedule with its retail customers.  It would then submit an order request to either Rebecca Check or Les Ares.  This did not guarantee acceptance of the order or assignment to any particular slot; it simply registered dealer demand.  An order verification form was still needed, along with payment of the

initial deposit.  The order verification form was not complete until S2 Yachts was able to assign a hull number and placed the order in the queue for actual production.  When sending the order verification form, S2 Yachts would also let the dealer know how much the deposit on the order was, and when it was due.  Final approval and the deposit were required before a completion spot was reserved and the factory would begin work on the boat.

The trial record illustrates the difference between the initial process under which a dealer registered demand interest, and the formal acceptance of an order for actual production.  Trial Exhibit L is an internal S2 Yachts spreadsheet kept by Ms. Check to track all of the initial dealer requests for production.  This exhibit records all the ERH Marine requests at issue here, but no hull number or other indications that the order verification form and deposit steps were complete.  These steps were ultimately completed for the S408 and DC295.   The order verification form for the S408 in Trial Exhibit 13 reflects the actual production schedule for that boat.  Unlike the informal dealer demand record of Trial Exhibit L, the S408 order verification form includes specific hull number assignments, reflecting completion of the order verification process on S2 Yachts' end.  The same is true for the DC295.  (Trial Ex. 27).  The S408 was ultimately delivered to ERH Marine's customer, and the DC295 was ultimately manufactured in Florida, albeit with an engine that did not conform to specification.  The critical order verification and deposit steps were never completed for the S368s, however.

### D.  ERH Marine's Orders for the 2018 Model Year

ERH Marine submitted multiple order requests for the 2018 model year.  It found a customer for an S408, as well as two other customers who each wanted an S368.  ERH Marine made these requests to Rebecca Check in an email on July 5, 2017.  (Trial Ex. 41).  The email attached one-page order request for all three boats, setting out selections for engine groups,

mechanical systems, individual options, and the like.  In its email, ERH Marine requested an October 2017 completion date for the S408 (approximately 3 months into the 2018 model year) and back-to-back February 2018 completion dates for the S368s.

ERH Marine also convinced another customer, Hatuey de Camps, to upgrade an order from a DC265 to a larger (and more expensive) DC295.  ERH Marine sent an order request for the DC295 to Les Ares on October 6, 2017, with a requested completion date of February 2018.  (Trial Ex. 20).  Like the other order requests, ERH Marine's email attached a one-page form detailing the selections for the DC295.   In engine group, the customer had selected twin Yamaha 300 horsepower engines.  (Trial Ex. G).  While not specified in the form, the parties agree these were supposed to be gray colored engines.

After submitting these requests, ERH Marine spoke with its customers.  It updated them on the requested production slots and told them that based on their experience, it was customary that the requested production slots would be honored.  ERH Marine also told the customers that there would be an order verification before the boats went into formal production, and at that point a deposit would be due.  This reflected both the written agreements and established practice requiring the order verification to trigger actual acceptance of an order, assignment to production, and payment obligations.

### 1. The S408

As the summer and fall progressed, the order for the S408 proceeded normally.  Rebecca Check sent ERH Marine an order verification form on August 24, 2017, shortly before the boat was scheduled for production.  She asked for a deposit and noted that the boat was scheduled for completion on November 2nd.  (Trial Ex. 13).  Delays at the Michigan factory postponed actual completion of the S408 a few weeks.  On September 24, 2017, Ms. Check sent ERH Marine a

message from the factory along with an updated order verification form showing a November 21, 2017, completion date for the S408.  ERH Marine requested a letter from S2 Yachts explaining the delay to its customer but did not otherwise complain.  Occasional delays of a few weeks were not out of the ordinary.  The boat was eventually delivered, and in January 2018, ERH Marine confirmed its customer was quite happy with the boat.  (Trial Ex. 27).

### 2.  The S368s

In contrast to the progress on the S408, S2 Yachts did not submit an order verification for either of the S368s.  Les Ares confirmed receipt of the ERH Marine request in July of 2017.  And Rebecca Check registered the dealer demand on her internal spreadsheet.  But no order verification form issued; no hull number or production assignment was made; and no deposit was demanded or paid for the S368s.

This lack of order verification for the S368s reflected S2 Yachts' overall production capacity restraints for that model.  S2 Yachts did not have enough production capacity to fulfill all the S368 orders that the dealers requested during the 2018 model year.  Thus, S2 Yachts had to use its retained contractual power to allocate the orders into the available production slots.  Not all orders could be accommodated during the model year.  This guaranteed that some dealers and customers would be delayed, or eliminated all together from the 2018 model year.  S2 Yachts used a variety of factors in deciding how to allocate available slots.  ERH Marine was not the only disappointed dealer on S368s during the 2018 model year.

### 3.  The DC295

The DC295 order did not receive an immediate order verification either.  Beginning in S2 Yachts' 2017 model year (so starting in August 2016 of the calendar year), the marine industry was hit with a series of supply challenges.  There was a shortage of materials, and the demand in

the industry outpaced what the suppliers were able to send to the factories.  There were issues in quality and consistency of materials as well.  The shortage included Yamaha engines.  S2 Yachts ultimately was able to send an order verification form for the DC295 to ERH Marine in January of 2018.  Production was scheduled for March 5, rather than the requested February date.  ERH Marine accepted that short delay, confirmed the specifications and paid the required deposit, putting the DC295 in line for actual production.

### E.   The Non-Renewal Complication

In November of 2017, S2 Yachts informed ERH Marine that it had decided not to renew the Pursuit Boats Dealer Agreement at the end of the model year.  S2 Yachts had no contractual obligation to renew, and no contractual obligation to have any reason, or to provide any reason, for a non-renewal decision.  ERH Marine, however, believed that S2 Yachts had an obligation under Dominican Republic law to renew the dealership, at least in the absence of good cause, or to pay damages.  ERH Marine lost that argument in court proceedings both here and in the Dominican Republic.  And there is no basis to relitigate that issue now.  But the dispute was raging and unresolved between November of 2017 and the end of the model year, and that complicated and warped the communications of the parties regarding the three open boat orders.  Ultimately, however, it is clear to the Court by preponderance of the evidence that the two S368 orders never ripened into an enforceable agreement for production, but that the DC295 order did.

### 1.   The S368 Order Verification And Deposit Process is Never Completed

ERH Marine reached out to S2 Yachts on January 10, 2018, to ask about all the open orders, including the two S368s.  (Trial Ex. 27).  Ms. Check responded the next day:

> In regards to the S 368, as you know, Holland has moved out
> production approximately 6 weeks.  In addition to this, we are not
> receiving as many production slots in MI as we initially expected.
> At this time we have not scheduled your stock S 368 and do not
> know when we will be able to.  Holland is doing everything they can
> to make up the time they lost, and if they can we will receive more
> production slots – we will keep you updated.

(Trial Ex. 27).  This triggered a flurry of follow up exchanges regarding both the number of open

S368 orders and the anticipated timing of delivery, culminating in an ERH Marine demand that S2

Yachts fulfill both S368 orders.

Mark Taiclet responded by invoking Section VII of the Pursuit Boats Dealer Agreement.

There was not enough production capacity at the Michigan facility, and the S368s could not be

built in the time frame ERH Marine had requested.  Still, Mr. Taiclet sought to find an acceptable

arrangement with ERH Marine.  He offered to schedule the boats for production early in the next

model year, which was not acceptable to ERH Marine.  Later, in March and April of 2018,

S2 Yachts tried to come to terms with ERH Marine on options for production before the end of the

current model year in July of 2018.  Ms. Check actually sent order verification forms to ERH

Marine on April 27, 2018, that would, if accepted, have called for delivery at the end of the model

year in July.  ERH Marine did not accept these order verifications or pay any deposits.

In fact, ERH Marine itself did not respond to them at all.  By this time the underlying

dealership non-renewal was in the hands of lawyers for both sides.  Each side's lawyers exchanged

posturing communications that overlapped, to some extent, with the communications between the

business parties.  Trust had obviously broken down on all sides.  What is clear, however, is that

with respect to the S368s, there was never an order verification accepted by both sides—either

through the business parties or their counsel.  Nor did ERH Marine ever pay or tender a deposit

for either of the S368s.

### 2. *S2 Yachts Fails to Complete the DC295 as Specified*

The DC295 order request, meanwhile, proceeded normally, at least initially. Rebecca Check sent the order verification form on January 11, 2018. (Trial Ex. 27) and Cristian Hernandez confirmed the specifications for ERH Marine the same day. (Trial Ex. 45). A deposit was paid, and later that month the parties communicated about modifying some of the options in the boat. An updated order verification was sent on January 24, and the boat was put into production in early February. (Trial Ex. 42). But the supply challenges eventually got in the way of completing the boat on time.

The crux of the matter came down to engine color. The DC295 had been ordered with gray, Yamaha 300 horsepower engines. But due to supply issues, those engines were not available when the DC295 was completed. On February 22, 2018, as the DC295 was being constructed, the President of Pursuit Boats, Bruce Thompson, sent an email to Pursuit Boats dealers, including ERH Marine, on the "Yamaha Engine Situation." He explained that Pursuit Boats had experienced delays in Yamaha filling S2 Yachts' purchase orders on time, and accordingly Pursuit Boats was completing boats without the installation of engines. Engines were being installed as they arrived, but the engine delay was affecting S2 Yachts' shipping schedule. He stated that the sales team would be in contact with the affected dealers. (Trial Ex. 30). Trial testimony amplified the engine supply challenges Pursuit Boats faced.

On February 27, 2018, Mark Taiclet emailed ERH Marine about Bruce Thompson's email. He explained that the DC295 would have to be equipped with white engines because of supply issues if the DC295 were to ship on time. These engines came at an increased cost, but S2 Yachts said it would not charge the difference. Mr. Taiclet asked ERH Marine to confirm whether it

11

wanted the change.  If ERH Marine insisted on gray engines, Mr. Taiclet stated there may be a shipping delay of several weeks.  (Trial Ex. 31).

ERH Marine did not immediately respond to the email, and on March 2, 2018, Rebecca Check sent the invoice for the DC295 to ERH Marine.  She stated that the boat was scheduled to be completed on March 6, 2018, but there was still no word from Yamaha on when the gray 300 horsepower engines would arrive.  She noted that the white engines could be installed immediately, at no extra charge.  Another option would be to install gray colored engines with a lower horsepower that Pursuit Boats had in stock.  (Trial Ex. 32).  ERH Marine again did not immediately respond.  At this point communications were coming predominantly through counsel.

A week later, on March 9, Rebecca Check emailed Cristian and Eudaldo Hernandez to let them know that the production of the boat had been completed, with the only remaining step being the installation of the engines.  She asked that ERH Marine send along final payment for the boat. With respect to the engines, she repeated the offer of installing the white 300 horsepower engines. But she also added that she had received confirmation there would be a pair of gray 300 horsepower engines that complied with the ordered specifications arriving at the factory on March 26, 2018.  These could be installed on the DC295 and the boat could be completed precisely as ordered.  She asked ERH Marine to verify, that day, whether it wanted the white engines installed, or whether it wanted to wait for the gray engines.  ERH Marine representatives testified that they understood from the email that the boat would be equipped with gray Yamaha 300 horsepower engines, as requested, on March 26.

On March 14, 2018, Mark Taiclet sent ERH Marine a letter on the pending order.  He stated that the boat had been completed and was ready for shipment.  Because ERH Marine had not responded, either to Rebecca Check's March 9 email or the earlier messages, the DC295 boat had

been equipped with the white colored engines.  Based on ERH Marine's lack of response, and failure to pay the balance on the boat, Mr. Taiclet wrote that Pursuit Boats was prepared to cancel the order on March 16.  If the order was canceled, a 10% cancellation fee of the price would be forfeited from the deposit.  (Trial Ex. 59).  Separately, Mr. Taiclet directed Les Ares to begin looking for a backup plan for the DC295, if ERH Marine did not reply to his message.  (Trial Ex. 36).  Mr. Taiclet's communication was confusing to ERH Marine, given Ms. Check's earlier e-mail.  It viewed Mr. Taiclet's message as demanding accelerated payment on a non-conforming boat.

On March 16, 2018, lawyers for ERH Marine responded to Mark Taiclet.  With respect to the orders, the communication stated that "all orders that are still in process should be carried out as originally agreed amongst both parties, with no modifications[.]"  (Trial Ex. 60).  Lawyers for both sides then traded shots.  On March 23, 2018, Mark Taiclet instructed Rebecca Check and Les Ares to find a new home for the DC295.  (Trial Ex. 63).  This was three days before the anticipated March 26, delivery of the conforming gray engines, and about a week after ERH Marine's counsel had confirmed that ERH Marine expected completion of pending orders—including the DC295— "as originally agreed . . . with no modifications."  S2 Yachts never installed gray engines on the DC295.  Instead, it sent the DC295 with white, non-conforming engines to a different dealer before March 26.  S2 Yachts also did not return the deposit paid by ERH Marine.[3]

---

[3] After this litigation ensued, S2 Yachts tendered back a portion of the deposit.  This was almost twenty-four months after S2 Yachts sold the boat to another customer.

## II.        ERH MARINE'S CLAIMS ON THE S368s

ERH Marine's first theory of breach alleges that S2 Yachts breached its obligations in the Pursuit Boats' Dealer Agreement to build the two S368s in February 2018—the time slots that ERH Marine requested in its July 5, 2017, email to Rebecca Check.  ERH Marine's basic position is that when it submitted an order request with a requested completion date, and S2 Yachts acknowledged receiving the email, the completion date was locked in, and S2 Yachts was required to complete the boat in that timeframe.  S2 Yachts says there was no binding order before both sides agreed to the specifications in an order verification form, and the dealer paid the deposit, neither of which happened here.

To prevail on a breach of contract claim in Michigan, a plaintiff must establish by a preponderance of the evidence the following elements: "(1) the existence of a contract between the parties; (2) the terms of the contract require performance of certain actions; (3) a party breached the contract; and (4) the breach caused the other party injury."  *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)).  A breach is a violation or infraction of an obligation by failing to perform one's own contractual promise, by repudiating the promise, or by interfering with another party's performance.  *Breach of Contract*, Black's Law Dictionary (8th ed. 2007).  "Nonperformance of an obligation due is a breach of contract[.]" *Woody v. Tamer*, 158 Mich. App. 764; 405 N.W.2d 213, 217 (1987).

The express terms of the Pursuit Boats Dealer Agreement are contrary to ERH Marine's position.  Section VII of that agreement provided that Pursuit Boats "reserves the right in its sole discretion and at any time to allocate Product among dealers and customers as it determines in its discretion[.]"  (Pursuit Boats Dealer Agreement § VII, Trial Ex. 3).  Moreover, both parties admit

14

that the written terms of the parties' agreement call for submission of an order verification form and payment of the initial deposit.  And neither of these things happened here.  Under the written terms of the agreements, S2 Yachts had no obligation to perform on the S368 orders.

 At bottom, ERH Marine does not really ground its claim on the S368s in the terms of the Dealer Agreement anyway.  Rather it contends that the parties' course of performance, or S2 Yachts' bad faith, requires a finding of breach.  Both arguments fail as a matter of law and there was a failure of proof at trial on these theories in any event.

### A.  Course of Performance

When reviewing contracts, generally "[t]he court examines the contract as a whole, giving effect to all parts and language of a written agreement according to their 'ordinary and natural meaning.'"  *Wonderland Shopping Center Venture Ltd. Partnership v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001) (quoting *City of Wyandotte v. Consol. Rail Corp.*, 262 F3d 581, 585 (6th Cir. 2001)).  "In interpreting a contract, this Court's obligation is to determine the intent of the contracting parties."  *Fun Fest Productions, Inc. v. Greater Boston Radio, Inc.*, Case No. 303980, 2012 WL 3319343, at *4 (Mich. Ct. App. Aug. 14, 2012) (citing *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375, 666 N.W.2d 251 (2003)).  "If the parties' intent is unambiguously clear from the language of the written agreement, the court must enforce the parties' intent as expressed in the writing."  *Wonderland Shopping Center*, 274 F.3d at 1092 (citing *Birchcrest Bldg. Co. v. Plaskove*, 369 Mich. 631, 120 N.W.2d 819, 823 (1963)).  However, extrinsic evidence, including evidence of the course of performance, may be used in interpreting ambiguous contract terms to discern the parties' intent.  "If the language of a contract is ambiguous, courts may consider extrinsic evidence to determine the intent of the parties."  *Fun Fest Productions, Inc.*, 2012 WL 3319343, at *4.  "A contract is ambiguous when

two provisions irreconcilably conflict with each other or when a term is equally susceptible to more than a single meaning." *Id.* (quoting *Coates v. Bastian Bros, Inc.*, 276 Mich. App. 498, 503; 741 N.W.2d 539 (2007)).

ERH Marine argues that the Pursuit Boats Dealer Agreement is sufficiently ambiguous when it comes to the reservation process of production slots such that the Court should look to extrinsic evidence to determine the parties' intent. That evidence, ERH Marine argues, demonstrates that a production slot was reserved when Rebecca Check informed ERH Marine of the next available production slot, ERH Marine sent an order request referencing that slot, and Rebecca Check (or someone else at S2 Yachts) acknowledged the receipt of the order request. Under this understanding, ERH Marine claims S2 Yachts breached the Pursuit Boats Dealer Agreement by failing to manufacture the two S368s it ordered on, or within a few weeks' time, of the production slots it requested in February 2018.

ERH Marine's argument fails, first of all, because the terms of the contract are not ambiguous. Although neither the Pursuit Boats Dealer Agreement, nor the International Dealer Program it incorporated, expressly contemplated how requested completion dates would be handled, the contract was not ambiguous, nor was it silent. *C.f. Jackson v. Estate of Green*, 484 Mich. 209, 217, 771 N.W.2d 675 (2009) (noting "when a contract is silent as to time of performance or payment, absent any expression of a contrary intent, the law will presume a reasonable time."). Rather, the Pursuit Boats Dealer Agreement expressly reserved to Pursuit Boats "the right in its sole discretion and at any time to allocate Product [that is, boats] among dealers and customers as it determines in its discretion." (Dealer Agreement § VII, Trial Ex. 3). There is nothing ambiguous about this reservation. Pursuit Boats, in its discretion, was permitted to allocate orders as it saw fit. George Hetzel testified that a variety of considerations went into

16

allocation, including the market demands, and needs of both S2 Yachts and the other dealers.  But ultimately the decision on how to schedule boats into production was left up to S2 Yachts, and representatives for S2 Yachts testified how they went about scheduling a boat for production.  All credibly testified that a production slot was not reserved simply by virtue of a requested production date submitted with the order request.

Under Michigan's version of the Uniform Commercial Code, any course of performance or dealing would have to yield to the express terms of the agreement:

> (5)    Except as otherwise provided [in the modification provision of Section 2209 discussed *supra*], the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other.   All of the following apply if that construction is unreasonable:
>
> (a)    Express terms prevail over course of performance, course of dealing, and usage of trade.

MICH. COMP. LAWS § 440.1303.  Here, ERH Marine's construction is inconsistent, not consistent, with the express terms of the agreement.  To conclude, as ERH Marine suggests, that S2 Yachts was bound by a parties' requested date when it submitted an order would be inconsistent with the terms of the Dealer Agreement and would read out of the contract the reservation that the parties mutually agreed would remain with Pursuit Boats.   Even an established course of performance or dealing cannot do that.

Moreover, there was a failure of proofs on ERH Marine's theory at trial.  At best, the evidence would substantiate a finding that before the 2018 model year, S2 Yachts was able to accommodate ERH Marine's requests for production slots and—provided that the order verification form was approved and the deposit paid—was able to complete the orders within a few weeks of the date that ERH Marine requested.  S2 Yachts' ability to manufacture boats on a

17

requested date changed in 2017 because of the combination of increased demand and production challenges, but nothing in the record demonstrates that a dealer's request for a production slot was ever locked in when S2 Yachts acknowledged an order, even before the external market forces began to affect S2 Yachts.  To the contrary, witnesses for S2 Yachts all credibly testified that after an order was submitted, the requested completion date was an important consideration in scheduling a boat for production, but much more was necessary before a production slot was actually assigned to an order.  Rebecca Check testified, for example, that after receiving an order she would work with Mark Taiclet and Les Ares on finding a production slot.  She placed orders in an internal spreadsheet that noted the completion dates the dealer requested.  But only when a production slot was found was a boat assigned a hull number.  And even then, there was not a "firm order" until the dealer had verified the specifications in the order verification report and paid the deposit.  Until that point, there was no guarantee a boat would be manufactured in a given timeslot or placed in the production queue.

This record evidence along with the language of the agreement also dooms ERH Marine's argument that S2 Yachts waived the reservation right through its course of conduct.  The parties agreed that the Dealer Agreement "may be amended or modified only by written instrument signed by both parties."  (Dealer Agreement § XV, Trial Ex. 3).  Michigan law provides "[a] signed agreement which excludes modification or recession except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party."  MICH. COMP. LAWS § 440.2209(2).  Accordingly, parties to a contract governed by the U.C.C. may provide in writing that amendments or modification to their contracts may only be in writing.  *See West Cen. Packing Inc. v. A.F. Murch Co.,* 109 Mich. App. 493, 505; 311 N.W.2d 404 (1981).  True, "parties to a

contract are free to *mutually* waive or modify their contract notwithstanding a written modification or anti-waiver clause." *Quality Products*, 469 Mich. at 364; *see also* MICH. COMP. LAWS § 440.2209(4) (noting that an attempt at modification or recission of a contract can operate as a waiver). For the reasons set out above, however, there is no evidence that S2 Yachts either expressly or impliedly waived the reservations provision in the Dealer Agreement. *See Quality Products*, 469 Mich. at 373-74 (holding that where course of conduct is asserted as basis for modification of unambiguous contract, mutual assent to waiver of contractual requirement must be shown by clear and convincing evidence). And even if S2 Yachts had waived the reservation section, it notified ERH Marine in advance of February 2018 that it was exercising its rights under the reservations clause and allocating production in its discretion. Mark Taiclet expressly referenced the reservations in his January 29, 2018, email to ERH Marine. (Trial Ex. 56). Under MICH. COMP. LAWS § 440.2209(5), "[a] party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver." Whatever understanding ERH Marine may have had of the parties' history of performance, it was on notice no later than January that S2 Yachts was invoking the reservation provision in the Dealer Agreement to allocate product in its discretion.

For all these reasons, then, ERH Marine has failed to establish S2 Yachts breached the Pursuit Boats Dealer Agreement under a course of performance or dealing theory with respect to the S368s.

### B.  Bad Faith

ERH Marine's second theory with respect to the S368s is that S2 Yachts breached the Pursuit Boats Dealer Agreement by acting in bad faith.  The evidence presented at trial fails to support this argument.

Michigan common law recognizes an implied covenant of good faith and fair dealing that applies to the performance and enforcement of contracts.  *See Ferrell v. Vic Tanny Int'l, Inc.*, 357 N.W.2d 669, 672 (Mich. Ct. App. 1984); *Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975).  Michigan courts rely on an implied good faith covenant "[w]here a party to a contract makes the manner of its performance a matter of its own discretion[.]" *Burkhardt*, 226 N.W.2d at 680; *see also Ferrell*, 357 N.W.2d at 672.  However, "when the parties have 'unmistakably expressed their respective rights' . . . , the covenant does not adhere." *Stephenson v. Allstate Ins. Co.,* 328 F.3d 822, 827 (6th Cir. 2003) (quoting *Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 877 (5th Cir. 1989)); *see also Burkhardt*, 226 N.W.2d at 680. "The obligation of good faith cannot be employed, in interpreting a contract, to override express contract terms." *Parlovecchio Bldg., Inc. v. Charter Cnty. of Wayne Bldg. Auth.,* No. 313257, 2014 WL 631264, at *4 (Mich. Ct. App. Feb. 13, 2014) (quoting *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 657 (6th Cir. 2000) (applying Michigan law)); *see also Van Arnem Co. v. Mfr. Hanover Leasing Corp.*, 776 F. Supp. 1220, 1223 (E.D. Mich. 1991).

The trial record does not demonstrate that S2 Yachts acted in bad faith when it informed ERH Marine it could not build the S368s in February, as ERH Marine had requested.  George Hetzel and other S2 Yachts witnesses credibly testified that supply challenges meant that S2 Yachts was not able to meet all the demands of its customers in the 2017, 2018, and 2019 model years.  S2 Yachts' ability to meet the requested completion dates deteriorated throughout the 2018

model year, and the supply constraints particularly affected its ability to complete S368s.  This testimony is consistent with what happened on the ground.  For example, S2 Yachts was able to complete an S408 that ERH had requested for completion earlier in the 2018 model year, but it was unable to meet the requested completion date for the S368s later in the model year.  In this, S2 Yachts did not single ERH Marine out or treat them any worse than other dealers.  Rather, due to the reality of the market, S2 Yachts had to let some dealers, including ERH Marine, down.  There was nothing that breached the duty of good faith here.

ERH Marine nevertheless insists that there was bad faith based on the actions of individual Pursuit Boats employees.  It contends the entire trajectory of their business relationship with S2 Yachts irreconcilably soured when Les Ares told Cristian Hernandez to consider selling a customer's boat "on the open market" and ERH Marine did so.[4]  When the dealer covering that territory complained, ERH Marine says Mr. Ares, Mark Taiclet, and others failed to acknowledge their own responsibility and doubled down on blaming ERH Marine, ultimately leading to non-renewal of the dealership.  ERH Marine says these employees added insult to injury by not letting ERH Marine attend the February 2018 Boat Show in Miami and then giving an incomplete picture of the situation to the two customers who traveled to the boat show to inquire about their orders.  ERH Marine contends that Les Ares never placed the boats in the production schedule in July 2017 and S2 Yachts' belated efforts to schedule them later in July 2018 was too little, too late and not in keeping with normal order and deposit requirements.  Moreover, ERH Marine says its customers were losing interest in the S368s by this time anyway.

---

[4] The boat at issue was the DC265 that Hatuey de Camps had originally ordered before deciding to upgrade to the DC295.

S2 Yachts disputes ERH Marine's view of these facts and asserts that it never approved the sale of the DC265 to a customer in another dealer's territory, and that ERH's decision to do so created a real problem for S2 Yachts. Ultimately, it's not necessary to resolve every factual quibble about this episode because S2 Yachts did not need to have any reason—let alone a good reason— not to renew the dealer arrangement. So even assuming for purpose of argument that S2 Yachts made a bad business decision in not renewing the agreement with ERH Marine that does not demonstrate that S2 Yachts acted in bad faith. After all, the plain terms of Section II of the Dealer Agreement provided that S2 Yachts could elect not to renew the Dealer Agreement beyond the end of the model year provided it gave notice, which it did. This Court has already entered a Rule 54(b) Judgment against ERH Marine on these issues, and the Court of Appeals has affirmed. So why S2 Yachts decided not to renew, and whether that was a good business decision, is beside the point.

Moreover, the record evidence belies ERH Marine's claim that S2 Yachts treated ERH Marine in bad faith by allegedly ignoring their orders. On August 3, 2017, Rebecca Check sent a spreadsheet showing the production slots for the boats that had been requested. The spreadsheet included the two S368s and showed the dates that ERH Marine requested. (Trial Ex. L). Ultimately S2 Yachts was not able to find an available slot within the date range, but the trial evidence established this was not due to any animus towards ERH Marine. ERH Marine's complaints about inconsistent messaging from S2 Yachts employees, and its treatment towards its customers, also fails to demonstrate any bad faith. If anything, the record evidence demonstrates that S2 Yachts treated ERH Marine better by endeavoring to find slots for ERH Marine's customers. It ultimately did find slots within the 2018 model year. And Eudaldo Hernandez admitted that the process Rebecca Check used when she sent the order verification forms for the

S368s was basically the same as the process used in its previous orders.  So ultimately, with respect to the S368s, S2 Yachts did precisely what ERH Marine had demanded in its March 16, 2018 communication—which is that all orders still in process be carried out as originally agreed.  S2 Yachts presented ERH Marine with an order verification form, and request for deposit, that complied with the terms the parties had originally agreed to.  ERH Marine decided not to go forward for its own reasons.  ERH Marine cannot demonstrate bad faith on S2 Yachts' part on this record.

Applying Michigan law to the contractual provisions of this case, the record at trial establishes that the parties set out the limits of what the Pursuit Boats Dealer Agreement requires of them.  With respect to the S368s, S2 Yachts followed these provisions and ERH Marine has established no basis on which to hold S2 Yachts liable for breach.  For all these reasons, the Court determines that ERH Marine has failed to establish that S2 Yachts breached the Pursuit Boats Dealer Agreement by failing to fulfill the two S368 order requests.

III.    **ERH MARINE'S CLAIM ON THE DC295**

The remaining theory of breach in ERH Marine's counterclaim is that S2 Yachts breached the Pursuit Boats Dealer Agreement when it failed to complete the DC295 with the gray Yamaha 300 horsepower engines it had ordered, and then sold the boat out from under ERH Marine despite holding ERH Marine's deposit, all just days before conforming gray engines were due at the factory.  The Court determines that ERH Marine has established a breach and that it is entitled to some, but not all, of the damages it requests.

### A.  Breach

Nobody disputes that an order request for the DC295 was placed by ERH Marine and accepted by S2 Yachts.  Nor is there any disagreement that ERH confirmed the order verification for the boat and paid the deposit so as to put the order into the production schedule.  And the parties agree that the boat was ordered with Yamaha gray 300 horsepower engines.  However reasonable the alternatives that S2 Yachts presented may have been, ERH Marine could insist the boat be manufactured as ordered.  Furthermore, there is no disagreement that the boat was never completed with the gray engines installed.  Nevertheless, S2 Yachts says there was no breach because ERH Marine abandoned the order by failing to let S2 Yachts know whether it would accept the various alternatives offered or insist on the original order terms; and by not tendering full final payment for the DC295.  ERH Marine denies that it ever breached the DC295 contract, or otherwise failed to perform in a way that justified S2 Yachts' decision to sell the boat to someone else, rather than complete performance as agreed and sell the boat to ERH Marine, which had already paid the required deposit.

"Whether there has been an abandonment of a contract is a matter of fact."  *Chalk Supply LLC v. Ribbe Real Estate LLC*, Case No. 345805, 2020 WL 39991, at *9 (Mich. Ct. App. Jan. 2, 2020) (citing *Dault v. Schulte*, 187 N.W.2d 914 (1971)).  "Abandonment is shown where a party 'positively and absolutely refuses to perform the conditions of the contract . . . or where by his conduct he clearly shows an intention to abandon the contract.'"  *Id.* (quoting *Collins v. Collins*, 348 Mich. 320, 327; 83 N.W.2d 213 (1957)).  "A contract will be treated as abandoned when acts of one party, inconsistent with the existence of the contract, are acquiesced in by the other party."  *Dault*, 31 Mich. App. at 701.

The Court finds as a matter of fact that ERH Marine did not abandon the order for the DC295.  To be sure, it could have been more prompt in responding to S2 Yachts' inquiries during February and March, though the lines of communication for both sides were warped at the time by their broader dispute over non-renewal and brewing animosity between the parties.  But the record nevertheless demonstrates that ERH Marine (via its counsel) told Mark Taiclet on March 16, 2018, that "all orders that are still in process should be carried out as originally agreed."  (Trial Ex. 60).  This was the final "drop dead" date S2 Yachts had set.  There is no way to understand this letter other than communicating a clear direction that S2 Yachts proceed with the DC295, as ordered, and install the gray engines that were originally agreed to by the parties.   S2 Yachts never did so.  Instead, it completed the boats with white engines and sold it to someone else just a few days before Ms. Check told ERH Marine that a pair of gray engines was due to arrive at the factory.

S2 Yachts counters that even so, ERH Marine never tendered the full payment that was required under the terms of the International Dealer Agreement.  This theory of abandonment also fails because S2 Yachts never completed the boat to the specifications ordered.  Moreover, it did not even wait for March 26 to see if the gray engines actually arrived as expected so completion to order was possible.  As Les Ares testified, the most that Rebecca Check indicated to ERH Marine was that gray engines that complied with the original order would arrive at the factory on March 26, not that the engines could be installed on that date.  So S2 Yachts never told ERH Marine when the DC295 would actually be completed as ordered.  Accordingly, even under the literal terms of the International Dealer Agreement requiring payment two weeks before completion, the payment obligation was never triggered.

Moreover, it is plain the parties did not require full payment until the boat was actually completed and ready to ship.  Both trial testimony and written exchanges establish this easily by a

preponderance.  Eudaldo and Cristian Hernandez testified as much.  And S2 Yachts' own communications on the DC295 confirm this.  For example, Rebecca Check's March 2, 2018, email on the DC295 stated that the boat was set to be completed the following week.  She stated that if ERH Marine elected to proceed with the proposed alternatives to the gray engines, the boat would be completed without delay, but she did not expect payment until the following week.  (Trial Ex. 32).  Clearly, S2 Yachts was not demanding payment two weeks, or even one week, before the completion date.  Rather it demanded payment when the boat was completed and ready to ship. And the boat was never completed as ordered.  Instead, S2 Yachts sold the boat to another dealer and kept ERH Marine's deposit.   ERH Marine has established a breach on this theory.

### B. Damages

The remaining matter is the amount of damages that ERH Marine is due under the breach for the failure to complete the DC295.  In its initial trial brief, ERH Marine's requested damages as to the DC295 consisted of $62,808 in lost profits and a return of the $37,180 deposit.  (ECF No. 169, PageID.6019-6020).  ERH Marine has refined that request, post-trial, and now requests $34,000 in lost profits, a return of the $37,180 deposit, and $102,693.75 in consequential damages representing the lost profits of servicing the DC295 over a five-year period.  S2 Yachts does not object, in theory, to a lost profit remedy—assuming ERH Marine establishes breach—but argues that the consequential damages theory on service fees is speculative.  S2 Yachts also disagrees that ERH Marine is entitled to a full return of the deposit.

Under Michigan law, the damages recoverable for a breach of contract "are those damages that arise naturally from the breach or which can *reasonably* be said to have been in contemplation of the parties at the time the contract was made." *Lawrence v. Will Darrah & Assoc., Inc.,* 445 Mich. 1, 13; 516 N.W.2d 43 (1994) (emphasis in original; citation omitted). In other words, with

respect to lost profits, the evidence must be "sufficient to allow a jury to infer that at the time the parties entered into the contract, the defendants reasonably knew or should have known that in the event of breach this plaintiff would lose profits." *Id.* at 15. "In order to recover prospective profits, a plaintiff must establish proof of lost profits with a reasonable degree of certainty." *Joerger v. Gordon Food Serv., Inc.,* 224 Mich. App. 167, 175; 568 N.W.2d 365 (Mich. Ct. App. 1997).

### 1. Lost Profits on Sale of the DC295

The Court finds that ERH Marine has established to a reasonable degree of certainly some of its request for lost profits. Eudaldo Hernandez testified that the International Dealer Program provided the dealer with a discount rate of 34 percent. (*See also* Trial Ex. 41). After accounting for certain costs, the ultimate margins that ERH Marine realized after selling the boat at retail were in the range of seventeen to eighteen percent. Translating margins into numbers, he testified that as to the DC295, ERH Marine's anticipated profit was in the neighborhood of $35,000 to $40,000. ERH Marine appears to have requested an amount at the bottom end of that range and seeks an award of $34,000.00 in lost profits.

A more precise calculation, however, is available using the method that Mr. Hernandez provided during his trial testimony. Mr. Hernandez agreed that the way to calculate the actual profits would be the net difference between the wholesale and retail price of the boat minus expenses for delivery. The invoice for the DC295 reflected a charged price of $214,475.00 for the DC295 with delivery costs included. This figure was the "Courtesy Pricing" that ERH Marine used as a beginning number to arrive at the total price it charged its customer, less the credit he received for the DC265 trade in. (Trial Ex. EE). The wholesale price of the DC295, which is the amount charged in the order verification report, was $185,900.03. (Trial Ex. 27). The difference between the two amounts results in a total amount of $28,574.97. The Court finds that ERH

Marine has established it suffered lost profits in that amount due to S2 Yachts' failure to manufacture the DC295 as ordered and deliver to ERH Marine.

### 2. *Consequential Service Fee Damages*

Turning to the service fees, Eudaldo Hernandez testified that ERH Marine expected additional revenue on any boat sale in the amount of servicing fees.  This included docking charges, maintenance and additional services boat owners typically purchased from ERH Marine  He estimated this amount was in the range of five percent to ten percent of the value of the boat each year.  For the DC295, he expected ERH Marine would have realized between $13,000.00 and $25,000.00 per year in additional servicing fees.  ERH Marine's request appears to split the difference between the range Mr. Hernandez testified to, and requests 7.5 percent of the retail price set out in the DC295 invoice ($273,850.00) for a total of $20,538.75.  ERH Marine seeks an award reflecting this profit for a period of five years, for a total award of $102,693.75.

The Court credits Mr. Hernandez's testimony that after a boat was sold, the dealer could expect to realize additional revenue relating to maintenance and other services.  As a dealer in the Dominican Republic operating for a period of over twenty years, Mr. Hernandez certainly had experience in selling boats, and knowledge about any additional services the boats would need. And in the Pursuit Boats Dealer Agreement, ERH Marine agreed to maintain a service department that, among other things, would provide post-sale service.  (Pursuit Boats Dealer Agreement § 4, Trial Ex. 3).   A figure in the middle of the range Mr. Hernandez testified to, while not exact, is certainly supported to a reasonable degree of certainly.

But the Court does not find a basis in the record to use the full retail price in the calculation. In his testimony (which is all ERH Marine depends on here) Mr. Hernandez testified that he estimated lost profits based on service fees at five to ten percent of the *value* of the boat, not the

retail price of the boat.  As any customer who has purchased a car off a lot knows, the value of the boat certainly is not the retail price of the boat.  Indeed, the value of the DC295 undoubtedly depreciated as the model year turned over, newer boats were made available, and due to ordinary wear and tear.  The Court credits Mr. Hernandez's testimony about ancillary revenue but finds that the courtesy price of $214,475.00 more closely approximates Mr. Hernandez's testimony and is properly used here.

Nor does the Court find that ERH Marine has established to a reasonable degree of certainty that S2 Yachts is accountable for such amounts for five years.  There was no proof presented at trial relating to how many years a DC295 might require maintenance.  Nor was there testimony about the length of time, in Mr. Hernandez's experience, a customer such as Mr. de Camps might own a boat before seeking a newer model.  Moreover, the Pursuit Boats Dealer Agreement was not going to be extended.  It is reasonable to believe the boat would require service from the dealer for the next model year, but there was no basis to conclude that ERH Marine would continue to provide that same level of service after the dealership agreement had been terminated. Furthermore, nothing would prevent ERH Marine from selling Mr. de Camps another boat from a different manufacturer and generating revenues off of that sale.  That sale would take some lead time, and likely mean ERH misses out on a year.  The Court's award accounts for that time.

Given all the above, the Court concludes that ERH Marine has demonstrated it is entitled to $16,085.63 in lost ancillary revenue for the single year.

### 3.  Deposit

ERH Marine also requests a return of the $37,180 deposit it paid towards the DC295 in January 2018.  S2 Yachts contends that if ERH Marine is entitled to lost profits, it cannot recover

its deposit fee as well.  To do otherwise, it says, would be a double award.  After all, in order to receive a profit on the boat, the full price of the boat (including the deposit) needed to be paid.[5]

S2 Yachts' argument would make more sense if the DC295 was purchased by ERH Marine for stock.  But it wasn't.  As Cristian Hernandez testified, one of the reasons the production schedule was important to ERH Marine was because it used this timeline to schedule its own invoicing with its customers for deposit and final payment.  In other words, the customer paid the cost of the boat, including the deposit.  In a seller's breach situation, S2 Yachts should have to return the full deposit and pay damages for the dealer to be made whole.  Moreover, the record demonstrates that S2 Yachts sold the DC295 boat to someone else, so they should not get that purchase price and still keep the deposit from ERH Marine. This is also consistent with the general rule in Michigan for a seller's failure to deliver, which includes recovery of any deposit paid.  *See* MICH. COMP. LAWS § 440.2711(1) ((specifying "recovering so much of the price has been paid" as one element of damages for seller's failure to deliver).

The Court finds that ERH Marine is entitled to damages in the amount of $37,180.00 representing the deposit it paid on the DC295.

---

[5] Maintaining it did not breach the Pursuit Boats Dealer Agreement by failing to install gray engines on the DC295, S2 Yachts does not dispute that ERH Marine would nevertheless be entitled to half of the unused deposit (keeping half for the cancellation fee contemplated in the agreement). S2 Yachts included in the exhibit book a check in the amount of $19,663.03 representing half the deposit, plus certain other undescribed credits that it tendered to ERH Marine.  (Trial Ex. 68). ERH Marine objected to the exhibit on the basis that it was tendered after discovery had closed. The Court reserved a decision.  In the posttrial briefing, ERH Marine discussed the exhibit.  It noted that the check was issued on November 6, 2019, but not tendered until March 23, 2020.  This check provided, however, that it was void after 90 days.  ERH Marine contends this should go into the mix in its bad faith argument.  Given that both sides have discussed the exhibit, the Court admits Exhibit 68, but the exhibit does not affect the Court's analysis. It does not demonstrate that S2 Yachts acted in bad faith in failing to complete the S368s. Nor does it demonstrate that ERH Marine abandoned the DC295 order.

## CONCLUSION

Ending a relationship is never easy, especially one lasting as long as this one.  The non-renewal piece of the dispute has been previously and finally resolved in favor of S2 yachts.  The only thing at issue here is liability regarding the boat order requests in the pipeline during the last year of the relationship.  The Court concludes that ERH Marine has established a basis for breach, and damages, on its contractual counterclaim only as it relates to the failure to complete the DC295 theory.  Judgment shall enter on the counterclaim in the amount of $81,840.60 in favor of ERH Marine and against S2 Yachts on Count IV.  Pre and post-judgment interest shall be added as prescribed by law.  Judgment shall enter in favor of S2 Yachts and against ERH Marine on Count V.


Dated:   November 16, 2021          /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                    CHIEF UNITED STATES DISTRICT JUDGE